IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 19, 2005

## STATE OF TENNESSEE v. SHONDA KAY GARCIA

**Direct Appeal from the Circuit Court for Obion County**
**No. 4-193      William B. Acree, Jr., Judge**

_____

**No. W2004-02287-CCA-R3-CD  - Filed May 9, 2005**

_____

The defendant, Shonda Kay Garcia, pled guilty to child abuse and neglect of a child six years of age or less, a Class D felony, in exchange for a two-year sentence as a Range I, standard offender, with the manner of service to be determined by the trial court. Finding that the defendant lacked remorse and that a pattern of child abuse and neglect had been established, the trial court denied the defendant's request for alternative sentencing and ordered that she serve her sentence in the Department of Correction. The defendant appeals the denial of alternative sentencing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Joseph P. Atnip, District Public Defender, for the appellant, Shonda Kay Garcia.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon and Kevin D. McAlpin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On June 7, 2004, the Obion County Grand Jury returned a one-count indictment charging the twenty-four-year-old defendant with aggravated child abuse of her four-year-old daughter, G.G.[1] On July 30, 2004, the defendant entered a best interest guilty plea to child abuse and neglect of a child six years of age or less, a Class D felony, in exchange for a two-year sentence, with the manner of

---

[1]Testimony at the sentencing hearing indicated that the victim had also been the victim of past sexual abuse. It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

service to be determined by the trial court at a later sentencing hearing. The prosecutor explained the facts underlying the defendant's conviction at the guilty plea hearing:

> If it please the Court, on April 23, 2004, [G.G.] -- and I believe she was approximately four years of age at that time -- she was brought to the emergency room by [the defendant]. Upon examination of the child, it was determined that the child's arm had been broken. It required surgery. I believe that there may have been a metal plate that was installed to repair the injuries to it.
>
> Based upon the examination of the doctors, the doctor's testimony would support the belief that this was not an accidental injury. And that is basically -- essentially, it would boil down around the testimony of the medical staff, Your Honor, because the child was not very communicative as to what exactly had happened.

In addition to the victim's right arm being broken, there was bruising on the victim's back and left arm, according to the arrest warrant sworn to by Union City Police Officer Kyle Kirk.

Stephanie Coleman, an investigator with the Department of Children's Services ("DCS"), testified at the September 3, 2004, sentencing hearing that all four of the defendant's children had been removed from the home and placed in foster care. DCS had been involved with the victim's family for over four years as a result of "many, numerous referrals" of "physical abuse, sex abuse, and environmental neglect." Coleman had been assigned to the family for about two years. During that time, there had been "[u]nexplained marks, bruises, scratches, stitches" and a "broken foot on [the oldest child] that wasn't quite explained," and which went untreated for three days. There was also "validated" medical proof of sexual abuse of G.G., although DCS was never able to establish the perpetrator. DCS had removed the children from the home on multiple occasions. She testified that the defendant was currently pregnant, and DCS planned to remove that child as well. She also testified about the extent of G.G.'s injuries on this occasion:

> I was the worker that was on call that responded to the call from the emergency room where [G.G.] had had her arm broken, and when I spoke with the ER doctor, his explanation to me was, this type of break -- it was a clean break, and it was displaced. If you take the arm and you have it -- the arm was broken right here, but it was broken in two and then displaced. So the bone was actually -- you could see the bone through the skin. There was actual surgery done to repair that break. I do believe they had to put pins in, and, you know, she has a scar, and they actually had to put her to sleep to do this.

The defendant testified concerning her version of the events that led to her daughter's broken arm, which she maintained was an accident:

-2-

Q. . . . Could you explain now to the Court how you think that [G.G.] got her arm broken?

A. Well, when I had took [sic] her to the hospital, I had lied about the actual happening of the accident. I didn't want anyone to know that I was washing my children's clothes out by hand. At the time of the accident, I was indeed washing the clothes. There was water in the bathroom floor.

Q. You were washing your clothes in the bathtub; right?

A. Yes.

Q. Okay, go ahead.

A. And my four-year-old daughter, [G.G.], she came in, and she asked if she could come and sit with me while I finished the laundry. And I clearly told her no, that I wanted her to go back and finish watching her cartoons. In the meantime, she kept insisting that she wanted to be in there, and I told her, I said, "[G.G.], there is water in the floor." I said, "Give me your arm. I'm going to hold on to the bathtub, and I will guide you around." Well, as I was guiding her around, she slipped in the water. And I pulled her forward. And when I pulled her forward, I lost grip of the bathtub, and I went back, and she had twisted and fell on top of me. Her right arm was mangled across my chest, which I carried a bruise for two weeks from. . . .

. . . .

Q. Okay. And you immediately called - - well, you immediately took her to the hospital?

A. Yes. We were there within 10 minutes.

At the conclusion of the hearing, the trial court ordered that the defendant serve her two-year sentence in confinement. The defendant thereafter filed a timely notice of appeal to this court.

## ANALYSIS

The defendant asserts on appeal that she "should have been granted full probation" and "requests the Court consider the possibility of her not being wholly culpable, and . . . grant a form of alternative sentencing." The State argues that the record supports the trial court's imposition of a sentence of incarceration. We agree with the State.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations

made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

As a standard offender convicted of a Class D felony, the defendant was presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (2003). Moreover, because she received a sentence of eight years or less, she was eligible for probation and the trial court was required to consider probation as a sentencing option. Id. § 40-35-303(a), (b). However, although the defendant was entitled to the presumption of alternative sentencing, she was not automatically entitled to probation as a matter of law. See id. § 40-35-303(b). "The trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof." State v. Kenneth Jordan, No. M2002-01010-CCA-R3-CD, 2003 WL 21051739, at *3 (Tenn. Crim. App. May 8, 2003) (citing State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996)). The burden was upon the defendant to show she was a suitable candidate for probation. Tenn. Code Ann. § 40-35-303(b) (2003); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); Boggs, 932 S.W.2d at 477. In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)), overruled on other grounds by Hooper, 29 S.W.3d at 9.

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Additionally, "[d]enial of probation may be based solely upon the circumstances of the offense when they are of such a nature as to outweigh all other factors favoring probation." Bingham, 910 S.W.2d at 456 (citation omitted).

The presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the State, the testimony of the accused or a defense witness, or any other source, provided it is made part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2003).

According to the defendant's presentence report, she was convicted in 1999 of theft under $500 and sentenced to eleven months and twenty-nine days, which was suspended, and was to be on supervised probation for six months, as well as pay a fine of $50. She had "no employment record."

In denying probation and alternative sentencing, the trial court relied on the defendant's lack of remorse and the "pattern of child abuse" established by evidence presented by the DCS. The trial court explained its ruling:

> The plea entered into by [the defendant] was a best-interest plea. She is coming into court today and has testified as to what happened. According to her testimony, it was a complete accident, she is guilty of no crime.
>
> The Court thinks that's somewhat significant, Ms. Garcia. If you were completely innocent, I don't see you entering a plea to this. Actually, it shows a little bit of remorse -- a lack of remorse on your part for what has happened. I think you

-5-

probably would have been in a better situation if you had come into court and tried to explain why you acted as you did.

The Court is considering the other evidence that has been presented by the Department of Children's Services. There's one thing that has been judicially established, and that is your other children have been taken from you. Four other children -- three other children in addition to the victim in this case. They have also talked about numerous referrals and this type of thing, numerous other occasions where they made investigations. But, in any event, all of this has resulted in the children being taken from you and that this child also will be taken from you, the one that you're pregnant with now. I don't know what the reason [was] for you doing this. I have no idea. But I'm satisfied there's a pattern of child abuse demonstrated by yourself, and I don't know if there's any good answer to it.

I'm going to sentence you to the Department of Correction.

Proof at the sentencing hearing established a pattern of abuse and neglect involving all of the defendant's children, including the victim in the present case, and a long history of involvement by the DCS. At the sentencing hearing, the defendant's attorney acknowledged that a "break [like that of the victim] usually is not caused by a fall, and that [the defendant's] explanation as to how it occurred is unlikely, but is possible." We conclude that the trial court appropriately considered the sentencing principles, as well as all available information as to the defendant and the offense. The record on appeal supports the court's determination as to the length of the sentence and the manner of service.

## CONCLUSION

Based on the foregoing authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE